1  Jason S. Hartley CA Bar No. 192514
   STUEVE SIEGEL HANSON LLP
2  550 West C Street, Suite 610
   San Diego, California 92102
3  Email: hartley@stuevesiegel.com
   Tel:    619-400-5822
4  Fax:    619-400-5832

5  George A. Hanson MO Bar # 43450
   *admitted pro hac vice*
6  STUEVE SIEGEL HANSON LLP
   460 Nichols Road, Suite 200
7  Kansas City, Missouri 64112
   Tel:    816-714-7100
8  Fax:    816-714-7101

9  Bradford B. Lear MO Bar # 53204
   *admitted pro hac vice*
10 Todd C. Werts MO Bar # 53288
   *admitted pro hac vice*
11 LEAR WERTS LLP
   2003 W. Broadway, Ste. 107
12 Columbia, Missouri 65203
   Tel:    573-875-1991
13 Fax:    573-875-1985

14              **IN THE UNITED STATES DISTRICT COURT**
               **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
15

16 EDUARDO CHAVEZ and TOMAS SOLIZ,          Case No. 3:07-CV-1932 L (NLS)
   individually, and on behalf of a class of others
17 similarly situated,                       **DATE: JUNE 7, 2010 AT 10:30 A.M**
                                            **LOCATION: COURTROOM 14**
18                          Plaintiffs,
19              v.                           **MEMORANDUM AND POINTS OF**
                                            **AUTHORITIES IN SUPPORT OF**
20 WIS HOLDINGS CORP and                     **PLAINTIFFS' UNOPPOSED MOTION**
   WASHINGTON INVENTORY SERVICE,            **FOR FINAL APPROVAL OF CLASS**
21 d/b/a                                     **ACTION SETTLEMENT AND**
   WIS INTERNATIONAL,                        **APPLICATION FOR ATTORNEY'S**
22                                           **FEES AND SERVICE AWARDS**
                           Defendants.
23                                           **SPECIAL BRIEFING SCHEDULE**

24          Plaintiffs seek final approval of this class action settlement reached with Defendants WIS

25 Holdings Corporation and Washington Inventory Service d/b/a WIS International ("WIS").

26 Class Notice has been completed pursuant to the Court's Jan. 4, 2010 Order (Doc. 172) and no

27 objections to the settlement were received.  For the reasons herein, Plaintiffs seek final approval

28 of the settlement and an award of attorney's fees and service awards.

1

## TABLE OF CONTENTS

2  TABLE OF CONTENTS.............................................................................................. ii

3  TABLE OF AUTHORITIES ...................................................................................... iii

4  PROCEDURAL  HISTORY........................................................................................ 1

5  TERMS OF PROPOSED SETTLEMENT .................................................................. 3

6

7        A.   The Terms of the Settlement and Distribution Formula ............................. 3

8        B.   The Class Notice ....................................................................................... 4

9        C.   Dismissal of Related Action ..................................................................... 6

10        D.   Service Awards and Attorney's Fees ........................................................ 7

11  ARGUMENT ............................................................................................................. 7

12     I.  FINAL APPROVAL OF THE PROPOSED CALIFORNIA SETTLEMENT IS
     APPROPRIATE............................................................................................ 7

13

14        A.   The Rule 23 Settlement is Presumed Fair Because it was the Result of Arm's Length
         Negotiations. ............................................................................................ 7

15        B.   Analysis of the Applicable Factors Favors the Settlement ........................ 8

16     II.    THE REQUESTED ATTORNEY'S FEES ARE REASOANBLE ............................. 14

17

18        A.   Attorney's Fees Should be Awarded Based on a Percentage of the Settlement
         Fund ......................................................................................................... 15

19        B.   A Fee That Approximates 25% of the Gross Settlement Fund is Reasonable.......... 16

20

21     III.    THE REQUESTED SERVICE AWARDS ARE REASONABLE ........................ 23

22  CONCLUSION.......................................................................................................... 24

23

24

25

26

27

28

1

2

## TABLE OF AUTHORITIES

3

**Cases**

*Barcia v. Contain-A-Way, Inc.,* No. 07-938, 2009 WL 587844, at *5
(S.D. Cal. March 6, 2009)............................................................................ 11, 21

*Barnwell v. Corrections Corp. of America,* Case No. 2:08-CV-02151-JWL-DJW
(D. Kan. Feb. 12, 2009) ................................................................................... 21

*Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980)........................................... 15, 16

*Boone v. City of Philadelphia,* No. 05-1851, 2009 WL 3646398, at *4
(E.D. Pa. Nov. 3, 2009).................................................................................... 11

*Brailsford v. Jackson Hewitt Inc.,* No. 06-00700, 2007 WL 1302978, at *4
(N.D. Cal. May 3, 2007) .................................................................................. 10

*Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir. 1998) .......................................... 23, 24

*Erie Cty. Retirees Ass'n v. County of Erie, Pennsylvania,* 192 F. Supp. 2d 369, 375-76
(W.D. Pa. 2002) ............................................................................................... 9

*Fairley et al. v. WIS Holdings Co. et al.,* No. RG08412688, Dept. 17, Sup. Ct. Cal.,
Alameda Cty ......................................................................................... 6, 7, 23

*Fulford v. Logitech, Inc.,* No. 08-cv-02041, 2010 WL 807448, at *3 n.1 (March 5, 2010)......... 23

*Garner v. State Farm Mut. Auto. Ins. Co.,* No. 08-1365, 2010 WL 1687832, at *14
(N.D. Cal. April 22, 2010)................................................................................ 10

*Gaskill v. Gordon,* 160 F.3d 361, 363 (7th Cir. 1998).............................................. 16

*Glass v UBS Fin. Svcs. Inc.,* No. C-06-4068, 2007 WL 221862, at *16
(N.D. Cal. Jan. 26, 2007) ................................................................................. 21

*Gribble v. Cool Transp. Inc.,* No. 06-04863, 2008 WL 5281665, at *9
(C.D. Cal. Dec. 15, 2008) ................................................................................. 8

*Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir. 1998) ............................... 8

*Hensley v. Eckerhart,* 461 U.S. 424, 436 (1983) ................................................... 17

*Hopson v. Hanesbrands Inc.,* No. CV-08-0844, 2009 WL 928133, at *12
(N.D. Cal. April 3, 2009) .................................................................................. 22

*In re Brooktree Secs. Litig.,* 915 F. Supp. 193, 196 (S.D. Cal. 1996) ...................... 16

*In re Charter Comm., Inc. Secs. Litig v. Stoneridge Investment Partners LLC,* No. 4:02-CV-
1186, 2005 WL 4045741, at *15 (E.D. Mo. June 30, 2005)........................................ 21

*In re Daou Syss., Inc., Secs. Litig.,* No. 98-CV-1537, 2008 WL 2899726, at *1
(S.D. Cal. July 24, 2008).................................................................................. 21, 22

*In re M.D.C. Holdings Sec. Litig.,* No. CV89-0090, 1990 WL 454747, at *7
(S.D. Cal. Aug. 30, 1990) ................................................................................. 20

*In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454, 457, 463 (9th Cir. 2000).................. 21

*In re Merck & Co., Inc. Vytorin Erisa Litig.,* No. 08-285, 2010 WL 547613, at *12
(D. N.J. Feb. 9, 2010)....................................................................................... 22

*In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 489 (S.D.N.Y. 1998)............. 23

*In re Pac. Enter. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995)............................ 12, 13, 22

*In re Sorbates Direct Purchaser Antitrust Litig.,* 2002 WL 31655191, at *3
(N.D. Cal. Nov. 15, 2002)................................................................................. 23

*In re Wash. Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1299, 1300-01
(9th Cir. 1994)................................................................................................. 19, 20

*In re: H&R Block Inc., Express IRA Marketing Litigation,* MDL Dkt. No. 1786,
  No. 4:06-md-01786....................................................................................... 22
*McPhail v. First Command Financial Planning, Inc.*, No. 05-179, 2009 WL 839841, at *6
  (S. D. Cal. March 30, 2009) (C.J. Gonzalez)........................................................ 10
*Navarro v. Servisair*, No. C 08-02716, 2010 WL 1729538, at *4 (N.D. Cal. April 27, 2010) .... 15
*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ........................... 8
*Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) ......................... 17
*Perry v. Nat'l City Bank*, Case No. 3:05-CV-00891-DRH-PMF (S.D. Ill. March 3, 2008)......... 21
*Powers v. Eichen*, 229 F.3d 1249, 1256-57 (9th Cir. 2000) ......................................... 17
*Prudential Ins. Co.*, 148 F.3d 283, 333 (3d. Cir. 1998)......................................... 16
*Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311
  (9th Cir. 1990)................................................................................. 15, 16, 17
*Staton v. Boeing*, 327 F.3d 938, 967 (9th Cir. 2003) ....................................... 17, 24
*Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990)......................... 10
*Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1268 (D.C. Cir. 1993) ....................... 16
*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002)....................... 17, 21, 22
*Woo v. Home Loan Group, L.P.*, No. 07-CV-202, 2008 WL 3925854, at *6
  (S.D. Cal. Aug. 25, 2008) ................................................................... 23
*Ybarrondo v. NCO Financial Systems, Inc.*, No. 05-2057, 2009 WL 3612864, at *5 (S.D. Cal.
  Oct. 28, 2009) .................................................................................... 11

**Statutes and Codes**
29 U.S.C. § 201 *et seq.*.................................................................................. 1
California Business and Professions Code, Section 17200 ........................................ 1
California Labor Code Section 226 ...................................................................... 1

**Other Authorities**
4 *Newberg on Class Actions* § 11.41 .................................................................. 8
Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*,
  108 F.R.D. 237, 255-56 (3d Cir. 1985)............................................................ 16
*Richard Posner, Economic Analysis of Law* §21.9, at 534-35 (3d ed. 1986) .............................. 19
Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and Class
  Counsel's Response*, 17 Rev. Litig. 525, 534 (Summer 1998) ................................... 16

**Rules and Regulations**
Federal Rule of Civil Procedure 23(h)............................................................... 14
Federal Rules of Civil Procedure 33 .................................................................. 2
Federal Rule of Civil Procedure 34 .................................................................... 2
Rule 23.............................................................................................. 1, 12
FLSA, Section 16(b) .................................................................................... 1
FLSA, Section 216(b) ................................................................................... 1

## PROCEDURAL HISTORY

California Class Members are approximately 16,650 individuals currently and formerly employed by WIS from October 7, 2003 to November 13, 2008 as Inventory Associates ("IAs") within the State of California.

On October 3, 2007, Plaintiffs filed a lawsuit against WIS as a Fair Labor Standards Act ("FLSA") collective action complaint pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 201 *et seq.*, and as a Rule 23 class action for violations of California state law, including Section 17200 of the California Business and Professions Code in the United States District Court for the Southern District of California on behalf of themselves and all similarly situated IAs. (Doc. 1). Specifically, Plaintiffs alleged that Defendants failed to compensate IAs for all hours worked, that Plaintiffs (and all other similarly situated IAs) worked substantial overtime hours for which they were not properly compensated, and that Defendants failed to properly pay Plaintiffs pursuant to California state law. The lawsuit asserted claims for violations of the FLSA and California state wage and hour laws and sought back pay for non-payment of wages, interest, liquidated damages, and attorney's fees. An Amended Complaint was filed on May 14, 2009 (Doc. 151) which added a claim for violations of California Labor Code Section 226.

WIS denied it was liable under any of Plaintiffs' claims and moved to dismiss certain claims. (Doc. 13). Chief among the defenses raised by Defendants and argued throughout this litigation was that certain of the alleged off-the-clock work was non-compensable preliminary or postliminary activity that was not indispensible to the work performed by Plaintiffs; that, to the extent Plaintiffs were not paid for all of their overtime compensation, the unpaid amounts were *de minimis*; and that the operation of certain penalties under the California Labor Code were unconstitutionally excessive in light of the limited actual damages allegedly sustained by Plaintiffs. In addition, due to claimed disparate and individualized employment experiences, Defendants consistently argued throughout the litigation and negotiation process that no class of "similarly situated" IAs existed and that Plaintiffs were precluded from pursuing this case as a Rule 23 class action or collective action under Section 216(b) of the FLSA. *See* Declaration of George A. Hanson at ¶ 5 (attached as Exhibit A).

Both in this action and through a related action filed in the Western District of Missouri, the parties have engaged in extensive, but targeted, discovery.  The discovery conducted by the parties included answering multiple interrogatories and requests for production of documents pursuant to Federal Rules of Civil Procedure 33 and 34.  In addition, the class representatives and a corporate designee of Defendants were subject to thorough depositions. *See Id.* at ¶ 6. Additionally, Class Counsel conducted in-depth interviews with class members and opt-in plaintiffs and analyzed comprehensive personnel, payroll, and compensation data relating to Plaintiffs' claims and Defendants' defenses, including dates of employment, payroll records, job descriptions, and company policies regarding timekeeping and the payment of overtime. Defendants produced a comprehensive database of employee time-keeping records comprised of over 3,000,000 individual time stamps.  These records described all time worked by California IAs in various categories tracked by Defendants.  *See id.*

Class Counsel worked with an outside database programmer to analyze this data. Class Counsel determined the number of shifts worked by class members during various relevant time periods – an analysis that was indispensible considering that the off-the-clock claims were primarily based on certain alleged un-captured work time at the beginning and end of the IAs' shifts.  Plaintiffs were also able to determine how often IAs worked shifts in which employees were transported by a WIS-provided van by cross-referencing records of van drivers with other time records for employees working the same inventory – data that assisted in assessing the prevalence and relative strength of Plaintiffs' claims that they were engaged to wait at the beginning and end of shifts. The number of shifts in which WIS-provided transportation was used was further cross-checked by Class Counsel through the visual inspection of nearly 1,000 hand-written travel logs. Class Counsel also determined the ratio of straight-time to overtime reflected in Defendants' time records and then engaged an outside consultant to develop a program to recalculate that ratio based on how much off-the-clock time is added to each shift. *See id.*

Finally, Class Counsel developed an interactive damages model which synthesized the above information, along with other relevant data, to assess the value of the class claims and potential class damages after accounting for various litigation risks. Class Counsel then conducted a detailed analysis of all this data and the relevant documents and testimony in order to evaluate and quantify the scope of the claims and damages claimed by Plaintiffs, as well as to evaluate the merits of Defendants' defenses. *See id.* at ¶ 7.

After exchange and analysis of the critical class data, the parties met in San Francisco, California on September 17, 2008 and conducted a formal mediation of this litigation with nationally-recognized and well-respected mediator, Michael Dickstein.  Although the parties did not reach a settlement at the mediation, the parties continued negotiations through the mediator. In November 2008, after extensive settlement negotiations, the parties arrived at an agreement in principle to settle the claims in the Lawsuit.  When material terms were finally agreed upon, counsel negotiated, prepared, and with Mr. Dickstein's assistance, executed a written Memorandum of Understanding.  *See id.* at ¶ 8.  Thereafter, over the next several months, and in accordance with the MOU, the parties exchanged additional class data and updated class payroll and compensation records, and negotiated and entered into a formal settlement agreement pertaining to the wage and hour claims of the California Class.  *See id.* at ¶ 9 (Exhibit A to Doc. 152.)

## TERMS OF PROPOSED SETTLEMENT

**A.      The Terms of the Settlement and Distribution Formula**

Under the terms of the proposed California Settlement, Defendants will provide significant benefits to a statewide California Class consisting of approximately 16,650 current and former IAs employed by Defendants in the State of California from October 7, 2003 through November 13, 2008.  *See* California Settlement Agreement at ¶ B.1.

To settle the California portion of this litigation, Defendants agreed to create a settlement fund in the amount of $14,850,000.00 ("California Class Settlement Fund"), inclusive of all alleged unpaid wage and hour claims, whether under federal or state law, liquidated damages,

penalties, interest, costs and attorney's fees. After the California Class Settlement Fund is reduced by Class Counsel's attorney's fees, expenses, and costs, service awards to Class Representatives and any claims administration fees in excess of $75,000, the California Class Settlement Fund shall be distributed to Class Members as follows.

First, each California Class Member who was net underpaid overtime, due to use of an allegedly incorrect overtime rate, shall be allocated an amount ten times the amount allegedly underpaid. *See* California Settlement Agreement at ¶¶ B.14; C.1. The remaining California Class Settlement Fund shall be distributed based upon a formula that takes into account (i) the number of hours worked in the Class Period and (ii) responses to the seven questions contained in the Claims Form. *See* California Settlement Agreement at ¶ C.2.

The seven questions were designed to address the various claims and defenses asserted in the lawsuit. A Class Member's share of the settlement fund is determined based on the frequency with which that Class Member experienced the conduct giving rise to a claim. Thus, the settlement allocation formula is responsive to each Class Member's individual's entitlement to relief.

All Class Members, regardless of whether they return a claim form, are entitled to the greater of a minimum allocation of no less than $40 or their net underpaid overtime allocation, provided they certify the address for delivery of their check. *See* California Settlement Agreement at ¶ C.4.

## B.    The Class Notice

Class Notice was mailed to 16,650 Class Members by the third party settlement administrator Garden City Group Inc. Every effort was made to find valid addresses for each Class Member. Garden City first performed a national change of address search to find updated addresses using the data provided by WIS. Garden City used these addresses to send the Class Notice. If a Class Notice was returned as undeliverable, Garden City performed a more advanced address search and remailed the notice. No limit was placed on the number of

remailings.  *See* Decl. of Jennifer M. Keough Regarding Notice and Settlement Administration ("Garden City Declaration") at ¶¶ 4-7, attached as Exhibit B.

Further, every effort was made to encourage participation in the monetary benefits of the settlement.  A postage prepaid business reply envelope was included for Class Members to return their completed claim form.  *See id.* at ¶ 5.  Class Members merely had to complete and sign the claim form, slip it into the envelope, and put it in the mail.  4,725 Class Members returned a timely and valid claim form.  *See id.* at ¶ 11.

Class Members were given clear notice of their right to object to the terms of the settlement.  No Class Member has filed an objection.  *See id.* at ¶ 9; Hanson Decl. at ¶ 10.  Class Members were also given the opportunity to opt-out of the settlement, and, at the Court's request, a form was provided in the Class Notice for Class Members who wanted to opt-out.  Only a tiny fraction of the class returned a timely and valid opt-out form.  *See, e.g.,* Garden City Decl. at ¶ 8 (53 timely and valid opt-outs were received out of 16,650 or .003%).  Although several Class Members returned both a claim form and an opt-out form, the parties agreed to send letters asking these Class Members to clarify their choice.  Most of these Class Members timely returned the letter clarifying their decision.[1]  *See, e.g., id.* at ¶ 8.

As the Court is aware, the settlement agreement also contemplates a certification form that Class Members, who do not return a timely and valid claim form, must complete in order to receive their minimum payment and/or net underpaid overtime allocation.  The purpose of this form is to ensure that WIS mails settlement checks only to valid addresses and properly identified Class Members.  During the settlement process, the parties disagreed over whether this form should be included in the Class Notice or mailed at a later date.  Plaintiffs believed that it should be mailed at a later date and only to those individuals who did not return a timely and valid claim form.  It was Class Counsel's opinion that doing so would increase participation in the monetary benefits of the settlement and prevent undue confusion.  *See* Hanson Decl. at ¶ 10.

---

[1]  There are some Class Members who did not respond to the deficiency letter.  The parties may require Court approval regarding how to treat these individuals and will file a proposal by the June 1, 2010 deadline for submission of any supplemental papers in support of the settlement.

After a hearing on February 9, 2010, the Court agreed to separate mailings, and certification forms were mailed on April 27, 2010 to those Class Members who did not return a timely and valid Claims Form. *See* Garden City Decl. at ¶ 12.

WIS also resisted Class Counsel's request that this mailing also include a postage prepaid business reply envelope. Class Counsel firmly believed, based on prior experience and representations from Garden City, that including a postage prepaid envelope would increase the number of forms returned. Accordingly, Class Counsel volunteered to the Court that it would pay the costs associated with this postage to ensure maximum possible participation among Class Members. (Doc. 177); *see* Hanson Decl. at ¶ 10.

As the Court is also aware, WIS discovered an additional 401 Class Members after the Class Notice was mailed. The parties sought and received the Court's approval to send supplemental notice to these Class Members. (Doc. 178). That Notice was mailed on March 30, 2010. *See* Garden City Decl. at ¶ 6. Certification forms were mailed to those Class Members who received the supplemental notice but did not return a claim form on April 29, 2010. *See id.* at ¶ 13. When WIS informed Class Counsel that it had discovered additional Class Members, Class Counsel agreed to permit those Class Members to participate in the settlement, but insisted that their claims not dilute the value of any claims made by the original Class Members. Thus, although the class size has grown since preliminary approval was granted, the value of each claim has not diminished. *See* Hanson Decl. at ¶ 10.

### C.      Dismissal of Related Action

A related state court action was filed against WIS by two Class Members prior to the settlement that alleged claims which were settled and pled as part of this action. *Fairley et al. v. WIS Holdings Co. et al.,* No. RG08412688, Dept. 17, Sup. Ct. Cal., Alameda Cty. In the interests of judicial economy, Class Counsel has negotiated with *Fairley* counsel to resolve the related claims of the plaintiffs in that case (Class Members in this case) as part of this settlement. Accordingly, Class Counsel has agreed with the *Fairley* counsel that it will (i) not oppose any request for service awards that do not exceed $1,000 each for the named plaintiffs in the *Fairley*

action and (ii) share attorney's fees with the *Fairley* counsel in recognition of the claims pled in that action that were settled as part of this case. The *Fairley* counsel has also agreed to dismiss the *Fairley* case.[2] *See* Hanson Decl. at ¶ 11.

### D. Service Awards and Attorney's Fees

Pursuant to the terms of the California Settlement Agreement, Plaintiffs' counsel requests a service award of $7,500 for each of the California Class Representatives for their efforts in prosecuting this case, including retaining counsel, reviewing and authorizing the filing of the Complaint, submitting information to counsel, participating in depositions, and assisting with the administration of this Settlement. Defendants do not oppose this application. *See* California Settlement Agreement at ¶ D.

Class Counsel also seeks approval of their attorney's fees for services incurred in this case since its inception and for future legal services and expenses incurred in connection with the California Settlement. Class Counsel seek an amount of 25% of the gross California Class Settlement Fund (less $2,000[3]), or $3,710,500.00, of the California Class Settlement Fund. Defendants do not oppose or dispute such application. *See* Cal. Settlement Agreement at ¶ D.

## ARGUMENT

### I. FINAL APPROVAL OF THE PROPOSED CALIFORNIA SETTLEMENT IS APPROPRIATE

#### A. The Rule 23 Settlement is Presumed Fair Because it was the Result of Arm's Length Negotiations.

The law favors settlement, particularly in class actions and other complex cases where substantial resources can be conserved by avoiding the time, cost, and rigor of prolonged litigation. *See Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982),

---

[2] This agreement does not increase or in any way affect WIS's obligations under the settlement agreement. Class Counsel has agreed to request $2,000 less than the 25% of the fund they are authorized to seek as attorney's fees and costs under the settlement in order to ensure that the request for incentive awards to the *Fairley* plaintiffs do not affect the Class Members or WIS.

[3] Class Counsel requests $2,000 less than 25% of the fund for the reasons described above.

*cert. denied*, 459 U.S. 1217, 103 S. Ct. 1219, 75 L. Ed. 2d 456 (1983) ("voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation . . . ."). The standard for approval of a settlement under Rule 23 is that the settlement must be "fundamentally fair, adequate and reasonable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); Fed. R. Civ. P. 23(e)(2). "[A]n initial presumption of fairness [applies] when a proposed class settlement . . . was negotiated at arm's length by counsel for the class. . . ." 4 *Newberg on Class Actions* § 11.41; *accord Gribble v. Cool Transp. Inc.*, No. 06-04863, 2008 WL 5281665, at *9 (C.D. Cal. Dec. 15, 2008) ("a presumption of fairness applies when settlements are negotiated at arm's length, because of the decreased chance of collusion between the negotiating parties").

This settlement was the result of arm's length negotiations and vigorous advocacy. *See* Hanson Decl. ¶¶ 8-9. This settlement occurred only with the assistance of a mediator and, even then, only after formal mediation failed to resolve the dispute. Intense negotiations and arm's length advocacy continued during the negotiation of the settlement agreement and throughout the settlement administration process. *Id.*

Accordingly, a presumption of fairness applies to this settlement.

**B.      Analysis of the Applicable Factors Favors the Settlement**

The Court must determine if the presumption of fairness is rebutted or if it should be sustained. In doing so, the Court may evaluate a number of factors: (1) the amount offered in settlement; (2) the extent of discovery completed and the stage of the proceedings; (3) the risk, expense, complexity, and likely duration of further litigation; (4) the experience and views of counsel; (5) the strength of the plaintiffs' case; (6) the risk of maintaining class action status throughout the trial, and (7) the reaction of the class to the proposed settlement. *Hanlon*, 150 F.3d at 1026.

**1.   The Amount Offered in Settlement**

Most critically, the settlement puts substantial amounts of money in the hands of Class Members and provides the Class with a substantial portion of the relief sought in the Complaint,

without the delay and expense of trial and post-trial proceedings. This is not a case where the benefit to the Class is largely injunctive or of speculative value. The settlement creates a $14,850,000 settlement fund, of which $11,050,000 is available for distribution to the Class after payment for attorney's fees, service awards, and costs related to settlement administration. Not including the net underpaid overtime allocation, this settlement makes available to Class Members up to $1.80 per hour worked. The average length of a shift for an IA was 6.1 hours and the average rate of pay was $9.00 per hour. Thus, an IA who worked an average shift will receive up to $10.98 per shift as part of the settlement, which is the equivalent of an additional 1.2 hours of pay per shift, or said another way, a 20% of retroactive raise. *See* Hanson Decl. at ¶ 12.

Of course, the amount that each Class Member will receive will vary substantially based on how he or she answered the questions on the claim form (said answers being informed by each Class Member's individual work experience). The Court should note that the claim form asks questions about the duration of each Class Member's off-the-clock activities and the most valuable answers total approximately seventy minutes per shift, which is slightly less than 1.2 hours per shift of pay that is available under the terms of the settlement. Amounts paid to Class Members with long tenures could be very significant. For example, a Class Member who worked 4,000 hours during the class period (roughly equivalent to two years of full time work) is eligible to receive up to $7,200. This is a significant amount of money under any circumstances, but it is especially significant in light of the challenging economy suffered by low wage earners like the Class Members. *Id.*

Although the maximum possible award at trial may be larger than the settlement amount, it may also be less, or none at all. The inquiry as to whether a settlement is reasonable examines the benefits of the settlement in light of the risks of establishing liability and damages. *See, e.g., Erie Cty. Retirees Ass'n v. County of Erie, Pennsylvania*, 192 F. Supp. 2d 369, 375-76 (W.D. Pa. 2002). By any objective measure, the compensation this settlement makes available to Class Members is favorable and provides Class Members reasonable consideration for their claims.

Accordingly, the first factor strongly favors the presumption that this settlement should be approved.

### 2. The Reaction of the Class to the Proposed Settlement

The Class Members' reaction to the settlement has been overwhelmingly positive.

Significantly, *no* Class Member objected to the settlement. "The presence of a small minority of objectors strongly supports a finding that the settlement is fair, reasonable, and adequate." *McPhail v. First Command Financial Planning, Inc.*, No. 05-179, 2009 WL 839841, at *6 (S. D. Cal. March 30, 2009) (C.J. Gonzalez). "Thus, the Court 'may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it.'" *Garner v. State Farm Mut. Auto. Ins. Co.*, No. 08-1365, 2010 WL 1687832, at *14 (N.D. Cal. April 22, 2010); *accord Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118-19 (3d Cir. 1990) (finding 29 objections out of a 281 member class "strongly favors settlement"). In this case, the lack of *any* objectors especially demonstrates the fairness, reasonableness and adequacy of the settlement, particularly in light of the large size of this Class.

Additionally, a tiny fraction of the Class, amounting to only one-half of one percent, chose to timely and validly opt-out of the settlement. *See* Garden City Decl. at ¶ 8. Such a "low level of opt-outs is an indication of the Class Members' acceptance of the settlement as fair and adequate." *Brailsford v. Jackson Hewitt Inc.*, No. 06-00700, 2007 WL 1302978, at *4 (N.D. Cal. May 3, 2007); *accord Garner,* No. 08-1365*, 2010 WL 1687832, at *15 (N.D. Cal. 2010) ("over 99.5% of the recipients of the Class Notice chose to remain part of the Settlement Class, which is a further indication of the fairness of the Settlement.").

Finally, every Class Member had an opportunity to claim the monetary benefits of this settlement. *See McPhail,* 2009 WL 839841, at * 6 ("Importantly, every class member had the opportunity to participate in the settlement under the same terms"). Indeed, Class Members were not only provided the necessary form and instructions to make a claim, but each Class Member was given a postage prepaid business reply envelope to return their claim form. Final tabulations are not available as of the date of this filing because timely and valid certification forms continue

to be received. Currently, however, Garden City reports that approximately $5,827,834.79 of the California Class Settlement Fund has been claimed and approximately 27.44% of Class Members returned timely and valid claim forms. *See* Garden City Decl. at ¶ 11. This response rate supports a finding that this settlement should be approved. *McPhail,* 2009 WL 839841, at *6 ("Class members timely submitted 60,515 claims out of the 207,412 potential claims, representing 29.18% of the entire class. . . . This class member reaction weighs in favor of granting final approval."); *see also Boone v. City of Philadelphia*, No. 05-1851, 2009 WL 3646398, at *4 (E.D. Pa. Nov. 3, 2009) (approving settlement with "a claims rate of 15%."). This is especially true given "the nature of the employment position at issue – a low-level, transitory job, often filled by people without a permanent address-probably resulted in the submission of fewer claims than average." *Barcia v. Contain-A-Way, Inc.,* No. 07-938, 2009 WL 587844, at *5 (S.D. Cal. March 6, 2009) (approving settlement in wage and hour class action where approximately 20% of class members returned claim forms). Class Counsel's analysis of the employment data prior to settlement confirms that this was a job with a very high rate of transitory workers. *See* Hanson Decl. at ¶ 7.

Furthermore, even though 27.44% of Class Members returned a timely and valid claim form, a *much higher percentage* of the settlement fund has been claimed as more Class Members with larger claims returned claim forms than did Class Members with smaller claims, which is to say that those more adversely affected by WIS's alleged conduct were much more likely to have returned a claim form. The result is that at least 5.8 million dollars will be paid to the approximately 4,725 Class Members who returned a timely and valid claim form. This amount represents over half of the available settlement fund (after reductions for attorney's fees, service awards, and costs related to settlement administration). This Court recently approved a class action where far less than this amount was distributed from the settlement fund upon which claims could be made. *See Ybarrondo v. NCO Financial Systems, Inc.*, No. 05-2057, 2009 WL 3612864, at *5 (S.D. Cal. Oct. 28, 2009) (approving settlement where 12% of $31,000 settlement fund was distributed). Moreover, the amount to be distributed from the settlement fund is certain

to increase as the settlement administrator continues to receive valid and timely certification forms.

For the reasons stated above, this important factor does not rebut the presumption that this settlement should be approved. Rather, this factor strongly supports the presumption for three independent reasons: (i) there have been no objections, (ii) only a tiny fraction of opt-outs, and (iii) a significant portion of the net settlement fund will be distributed.

### 3. The Extent of Discovery and the Stage of the Proceedings

As discussed in great detail above in the procedural history of the case, the parties engaged in significant discovery, factual investigations, modeling, and critical damages calculations in order to assess the value of the claims discounted by the risks of trial. Class Counsel examined voluminous documents, including WIS's policies and procedures, job descriptions, employment records, and payroll data. Class Counsel also conducted town hall meetings across California in order to fully understand the factual basis for Plaintiffs' allegations and the credibility of those allegations. Armed with this information, Class Counsel was able to evaluate the value of Class Members' claims and negotiate at arm's length for a fair Class settlement. *See* Hanson Decl. at ¶¶ 6-8.

Accordingly, this factor does not rebut the presumption of fairness.

### 4. The Expense, Complexity, and Duration of Further Litigation

Class actions are typically complex, and the Ninth Circuit has a "strong judicial policy that favors settlements" of such cases. *In re Pac. Enter. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). This case is indeed complex and carries significant risks for the parties as to both legal and factual issues, and litigating the case to trial would likely consume great time and expense. For example, Plaintiffs' claims involve both federal and state substantive law, Rule 23 and FLSA procedural standards, and the dynamics of unsettled questions of law and disputed questions of fact. Further litigation would have been costly and would have required significant class wide discovery, and a trial would have been uncertain. This settlement spares Class Members from

both. That the settlement makes significant monetary relief available to them now, rather than many years from now, favors approval and does not rebut the presumption of fairness.

### 5. The Experience and Views of Counsel

"Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enter. Sec. Litig.*, 47 F.3d at 378. The Class here has had the benefit of attorneys who are highly experienced in complex class action litigation, specifically wage and hour litigation, and who have negotiated many such class and collective action settlements. *See* Exhibits A-1 and A-2, Firm Resumes of Stueve Siegel Hanson LLP and Lear & Werts LLP. In Class Counsel's view, the settlement makes available significant monetary benefits to the Class, every Class Member has had an equal opportunity to participate, and the settlement should be approved, especially when one considers, among other things, the attendant expense, risks, difficulties, delays, and uncertainties of litigation, trial, and post-trial proceedings. *See* Hanson Decl. at ¶ 8.

### 6. The Strength of the Plaintiffs' Case

The parties naturally dispute the strength of the Plaintiffs' case, and the settlement reflects the parties' compromise of their assessments of the worst-case and best-case scenarios, weighing the likelihood of various potential outcomes. Absent settlement, WIS would have disputed to assert the various defenses described above, would have challenged certification, would have challenged the underlying facts, and would have contested Plaintiffs' interpretation of the relevant statutes and case law. Moreover, WIS has moved to strike parts of Plaintiffs' complaint that, if granted, would have precluded Plaintiffs from seeking a Rule 23 class action based on California state law claims, which would have precluded much of the monetary benefits made available under this settlement. The fact that Plaintiffs' achieved a settlement despite these obstacles, at a time when the very nature of this class action was being challenged, further demonstrates the fairness, reasonableness, and adequacy of this settlement. Accordingly, although Plaintiffs continue to believe in the merits of their case, this settlement reflects a reasonable compromise of each parties' position in light of the attendant risks of trial and post-

trial appeals.  This factor does not rebut the presumption that this settlement should be approved, but supports it.

### 7.   The Risk of Maintaining a Class Action through Trial

Although Plaintiffs believe the case is suited for class treatment, WIS contested that this case should proceed as a Rule 23 class action.  Plaintiffs allege that WIS failed to keep accurate records of all time worked by its IAs; in the absence of complete and accurate records, Plaintiffs would have faced challenges in proving liability and damages on a representative basis, contingent on rulings from the Court about each side's respective burdens of proof and presumptions under complex statutes, regulations, and case law.  Accordingly, this factor does not rebut the presumption of fairness.

### 8.   These Factors All Support the Presumption of Fairness

In sum, none of the applicable factors rebuts the presumption of that this settlement should be approved.  Rather, each factor merely reinforces and supports the fact that this is a fair, reasonable and adequate settlement that brings substantial and certain monetary value to Class Members now, rather than uncertain value to an uncertain number of people at an uncertain time after protracted litigation involving complex and changing labor law.  While both sides believe the facts support their respective positions, Plaintiffs and WIS reached this compromise after extended settlement discussion facilitated by a nationally requested mediator.   The parties therefore request that the Court grant final approval of the Rule 23 settlement.

## II.   THE REQUESTED ATTORNEY'S FEES ARE REASOANBLE

Federal Rule of Civil Procedure 23(h) provides that, as part of a class action settlement, "the court may award reasonable attorney's fees and nontaxable costs that are authorized . . . by the parties' agreement."   Defendants have agreed to pay attorney's fees as a term of this settlement, and the Court-approved Class Notice clearly informed Class Members that Class Counsel would seek fees in the amount of 25% of the California Class Settlement Fund.  No objections were received.  In accordance with the agreement and the Class Notice, Class Counsel

respectfully request 25% of the settlement fund, less $2,000.  This amount is "the benchmark" according to the Ninth Circuit, and is inclusive of costs and expenses.[4]  *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).  Class Counsel also requests, as agreed upon by the parties, service awards of $7,500.

### A.      Attorney's Fees Should be Awarded Based on a Percentage of the Settlement Fund

The Class Notice, which the Court approved, informed Class Members that attorney's fees would be awarded using the percentage-of-the-fund method.[5]  (Doc. 152, 172).  No Class Member objected.

Class Counsel, therefore, requests compensation from the settlement fund for their unpaid work in this case in the manner contemplated by the Court-approved Notice.  The United States Supreme Court has said that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980). The Ninth Circuit has endorsed the percentage-of-the-fund methodology of awarding attorney's fees in common fund cases, stating that "[a]lthough statutory awards of attorneys' fees are subject to 'lodestar' calculation procedures, *a reasonable fee under the common fund doctrine is calculated as a percentage of the recovery*." *Six (6) Mexican Workers*, 904 F.2d at 1311 (emphasis added).

The percentage-of-the-fund method is generally recognized as the superior method of calculating attorney's fees in common fund class action settlements, like this one, because it "more closely align[s] the lawyer's interests with those of his client by giving him a stake in a

---

[4]  The case law permits Class Counsel to seek recovery of costs and expenses *in addition* to 25% of the fund.  *Navarro v. Servisair*, No. C 08-02716, 2010 WL 1729538, at *4 (N.D. Cal. April 27, 2010).  Class Counsel's request for 25% of the fund in this case, however, *includes any recovery for costs and expenses*.  Class Counsel's combined costs and expenses incurred prosecuting this case to date are $74,402.59.  *See* Hanson Decl. at ¶ 13.  Thus, in effect, Class Counsel is seeking less than 25% of the fund because it is not separately seeking costs and expenses.

[5]  The Class Notice states:  "As part of the settlement, subject to Court approval, Class Counsel will apply for fees and expenses in an amount not to exceed $3,712,500.00, which is 25% of the settlement amount."

successful outcome." *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998); *accord Prudential Ins. Co.*, 148 F.3d 283, 333 (3d. Cir. 1998) (the percentage of the fund approach "rewards counsel for success and penalizes it for failure."); *In re Brooktree Secs. Litig.*, 915 F. Supp. 193, 196 (S.D. Cal. 1996) (citing *Six (6) Mexican Workers*, 904 F.2d at 1311).[6]   A task force authorized by the United States Court of Appeals for the Third Circuit concluded that the percentage-of-the-fund method ensures that class counsel will act in the best interests of the class.  *See* Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 255-56 (3d Cir. 1985).  Other commentators have similarly noted that the percentage-of-the-fund method is a means of "maximizing the recovery of the class." Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 Rev. Litig. 525, 534 (Summer 1998).   The percentage-of-the-fund method also preserves judicial resources by discouraging the filing of unnecessary motions, as counsel has an incentive to be efficient.  *See, e.g., In re Brooktree Secs. Litig.*, 915 F. Supp. at 196.

Accordingly, fees should be awarded as a percentage-of-the-fund, as contemplated by the Court-approved Class Notice and the settlement agreement and consistent with the above-cited authority.

## B.    A Fee That Approximates 25% of the Gross Settlement Fund is Reasonable

Under the percentage-of-the-fund method, Class Counsel is entitled to a percentage of the gross common fund created and made available to Class Members.  *Boeing Co.*, 444 U.S. at 480 (holding that attorney's fees should be awarded based on gross fund, not on the amount of the fund Class Members choose to claim); *accord Six (6) Mexican Workers*, 904 F.2d at 1311 ("The Supreme Court has stated that attorneys' fees sought under a common fund theory should be assessed against every class members' share, not just the claiming members."); *Staton v. Boeing*,

---

[6]  In contrast, the lodestar approach has been criticized as "emphasiz[ing] the accumulation of hours, promot[ing] inefficiency and delay[ing] the resolution of cases, and reward[ing] attorneys for protracted motion practice."  *In re Brooktree*, 915 F. Supp. at 196 (quoting and agreeing with statements made by counsel in that case); *accord Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1268 (D.C. Cir. 1993) (under the lodestar approach "attorneys are given incentive to spend as many hours as possible, billable to a firm's most expensive attorneys.").

327 F.3d 938, 967 (9th Cir. 2003) ("Under the 'common fund' doctrine, 'a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.'").  Because Class Counsel has made a gross settlement fund of $14,850,000 available to the Class, the Court should award fees based on a percentage of that amount.

As disclosed in the Court-approved Notice, the appropriate percentage is twenty-five percent (25%).  Although the typical range is as high as 30%, according to the Ninth Circuit, "25 percent of the fund [is] the 'benchmark' award that should be given in common fund cases." *Six (6) Mexican Workers,* 904 F.2d at 1311; *see also Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1050 (9th Cir. 2002) (characterizing 20-30% as the "usual range"). "A district court may depart from the benchmark but, 'if such an adjustment to the benchmark is warranted . . . it must be made clear by the district court how it arrives at the figure ultimately awarded.'" *Powers v. Eichen*, 229 F.3d 1249, 1256-57 (9th Cir. 2000) (reversing district court for departing from benchmark) (quoting *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)).

The Ninth Circuit has identified a number of factors the Court may consider in assessing whether it should depart: (1) the results achieved; (2) the risk of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases.  *See Vizcaino*, 290 F.3d at 1048-50.  Under these circumstances, none of these factors support a downward variance from the benchmark.  In fact, these factors merely reinforce the reasonableness of the requested fee.

## 1.  The Results Achieved

The Supreme Court has said that in an award of attorney's fees the "most critical factor is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).  Certainly, the results obtained on behalf of the Class in this case do not warrant a downward departure from the benchmark of 25%.  To the contrary, $11,054,500 has been made available to Class Members *after* payment for attorney's fees, service awards, and settlement administration.  As described in

great detail in Section I.B.1, this amount on an individual basis is significant as it is equivalent to a twenty-percent raise or over an hour of additional pay per shift. Further, as demonstrated above, a full time Class Member who worked for two years may receive up to $7,200. Moreover, these amounts do not include net underpaid overtime, which Class Members may receive in an amount equal to *ten times* their actual net loss.

Additionally, Class Counsel has not stopped working on behalf of the Class, even after settlement. When 401 additional Class Members were discovered, Class Counsel negotiated their participation in the settlement, without diluting the claims of the Class Members originally identified. Furthermore, Class Counsel insisted on mailing the certification forms separately from the claim forms, and they insisted on providing (and agreed to pay for) prepaid postage on the return envelopes – all to maximize participation in the monetary benefits of the settlement. *See* Hanson Decl. at ¶ 10

Accordingly, the results achieved in this litigation and the efforts undertaken by Class Counsel to ensure that all Class Members participate in the monetary benefits of the settlement support, rather than rebut, the benchmark fee request.

### 2. The Risk of Litigation

This factor also does not warrant a downward departure from the benchmark percentage. This case is anything but simple and pre-determined. In accepting this case, Class Counsel committed to a long and arduous fight against sophisticated Defendants with experienced counsel. Class Counsel was prepared and committed significant resources to this case, including the resources of two law firms and numerous lawyers and paralegals. As of May 19, 2010, Class Counsel has expended $74,402.59 in out-of-pocket costs, engaged a consultant/expert, and conducted town hall meetings across California. *See id.* at ¶13. Class Counsel was prepared and committed to manage a class of 16,650 people, achieve class certification, keep the class certified, prove liability on a representative basis, prove damages, and commit to what would have been weeks of jury trial and possibly years of post-trial appeals. The issues in this case depend heavily upon the facts and a constantly evolving area of the law.

*See id.* Consequently, Class Counsel assumed the risk that it would not be paid and that it would lose all costs if this case failed. Despite these risks, a substantial settlement was achieved.

### 3. The Contingent Nature of the Fee and the Financial Burden Carried by the Plaintiffs

Certainly, this factor does not justify a downward departure from the benchmark percentage. As of May 19, 2010, Class Counsel have spent 4,477.50 hours and $74,402.59 in out-of-pocket costs prosecuting this action, with no remuneration, and with the understanding that they would be compensated only if they succeeded. *See id.* at ¶¶ 13-15. Courts have recognized the need to reward Class Counsel who accept a case on a contingent fee basis because of the risk of non-payment that they face:

> It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases. *See Richard Posner, Economic Analysis of Law* §21.9, at 534-35 (3d ed. 1986). Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose.

*In re Wash. Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1299, 1300-01 (9th Cir. 1994) ("in the common fund context, attorneys whose compensation depends on their winning the case, must make up in compensation in the cases they win for the lack of compensation in the cases they lose."). The Court should not overlook the real risks that Class Counsel incur by accepting contingent fee cases, such as this one. Large-scale wage and hour class actions of this type are, by their very nature, complicated and time-consuming. Any law firm undertaking representation of a large number of affected employees in wage and hour actions inevitably must be prepared to make a tremendous investment of time, energy, and resources. Due also to the contingent nature of the customary fee arrangement, lawyers must be prepared to make this investment with the very real possibility of an unsuccessful outcome and no fee of any kind. The demands and risks of this type of litigation overwhelm the resources – and deter participation – of many traditional claimants' firms. Although Class Counsel has had some success in prosecuting wage and hour

cases in general, Class Counsel's experience confirms and reflects the tremendous risks in such cases. *See* Hanson Decl. at ¶ 14.

As reflected in *In re Washington*, it is axiomatic that lawyers accepting contingent fee cases should be compensated in amounts greater than those earned by lawyers who bill and receive payment by the hour, as this fact reflects the risks undertaken in a contingent practice. If a contingent-fee lawyer was awarded fees at the same level as an hourly-fee lawyer, it would be economically irrational for any lawyer to accept a contingent-fee case because there would be absolutely no incentive to accept the risks inherent in such representation. *See also id.*

Accordingly, this factor strongly supports a fee equal to twenty-five percent of the common fund.

### 4. The Skill Required and Quality of Work

This Court has seen first-hand and is able to evaluate first-hand the quality of the work and the skill necessary to prosecute this complex class action. As the Court is aware, disputes continue even post-settlement, as reflected by the three times the parties sought the Court's intervention to resolve important disputes over the claims process. Moreover, the Court does not see the many additional issues, both large and small, that Class Counsel must navigate during the settlement, in order to ensure that all Class Members are treated fairly and appropriately.

The quality and efficiency of Class Counsel's work on this case is also reflected in the result and its timing. "Early settlements benefit everyone involved in the process and everything that can be done to encourage such settlements—especially in complex class action cases—should be done." *In re M.D.C. Holdings Sec. Litig.*, No. CV89-0090, 1990 WL 454747, at *7 (S.D. Cal. Aug. 30, 1990) (awarding 30% of common fund where "Class counsel obtained this result in a very short period of time"). Class Counsel demonstrated that they were able to develop a compelling case, notwithstanding the Defendants' arguments that the case could not be successfully prosecuted through trial as a class and collective action. That Class Counsel successfully negotiated settlement relatively early in the case, avoiding further expenditure of resources by the parties and the Court further shows their skill and efficiency. In particular,

Class Counsel's skill in negotiating settlement while facing a motion to strike part of its complaint is precisely the type of "exceptional result" that "should be fully rewarded." *Glass v. UBS Fin. Svcs. Inc.*, No. C-06-4068, 2007 WL 221862, at *16 (N.D. Cal. Jan. 26, 2007) ("Class counsel's prompt action in negotiating a settlement while the state of the law remained uncertain should be fully rewarded."). Class Counsel's early recovery for the Class is a direct result of their legal acumen and diligence.

Additionally, that the total settlement fund is large is no basis for reducing the percentage of Class Counsel's fee. "[D]ecreasing the percentage [of attorney fees] as the recovery [to the class] increases … gives counsel an incentive to settle cases too early and too cheaply." *In re Charter Comm., Inc. Secs. Litig v. Stoneridge Investment Partners LLC*, No. 4:02-CV-1186, 2005 WL 4045741, at *15 (E.D. Mo. June 30, 2005). Class Counsel here exercised great strategic skill in settling and should not have their fee diminished merely because they were diligent and efficient.

### 5. Awards Made in Similar Cases

"In wage and hour cases, 'twenty-five percent is considered a benchmark for attorneys' fees in common fund cases.'" *Barcia*, 2009 WL 587844, at *5 (C.J. Gonzalez); *accord Barnwell v. Corrections Corp. of America,* Order Approving Settlement Agreement, Case No. 2:08-CV-02151-JWL-DJW (D. Kan. Feb. 12, 2009) (awarding 33 percent of the maximum gross settlement amount); *Perry v. Nat'l City Bank*, Order Approving Settlement, Attorneys' Fees and Service Awards, Case No. 3:05-CV-00891-DRH-PMF (S.D. Ill. March 3, 2008) (approving request for 33 percent of the settlement fund). This Court has also awarded twenty-five percent of a common fund as attorney's fees. *In re Daou Syss., Inc., Secs. Litig.,* No. 98-CV-1537, 2008 WL 2899726, at *1 (S.D. Cal. July 24, 2008). And the Ninth Circuit has, several times, awarded fees in excess of 25% of the common fund requested here. *See also Vizcaino,* 290 F.3d at 1050 (affirming 28% of fund as attorney fee); *In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454, 457, 463 (9th Cir. 2000) (affirming 33% of fund as fee); *In re Pac. Enter. Sec. Litig.*, 47 F.3d 373,

379 (9th Cir. 1995) (affirming 33% of fund as fee). Accordingly, this factor fully supports the benchmark fee request.

### 6. A Lodestar Crosscheck Supports the Requested Fee

Lastly, although not required, the Ninth Circuit permits a district court to conduct a "lodestar crosscheck" on a percentage-of-the-fund fee request. *See In re Daou Syss.* 2008 WL 2899726, at *1. "The lodestar analysis is performed by 'multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys.'" *In re Merck & Co., Inc. Vytorin Erisa Litig.,* No. 08-285, 2010 WL 547613, at *12 (D. N.J. Feb. 9, 2010) The lodestar multiplier is then calculated, "which is equal to the proposed fee award divided by the lodestar (i.e., the product of the total hours and the blended billing rate)." *Id.*; *accord Vizcaino,* 290 F.3d at 1051.

Class Counsel's lodestar is $2,056,930.00.[7] *See* Hanson Decl. at ¶ 15. Thus, the lodestar multiplier is 1.8. This multiplier is not unreasonable as "multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." 3 Newberg § 14.03 at 14-5; *accord Vizcaino,* 290 F.3d at 1051 (approving multiplier of 3.65 and identifying several other cases with multipliers of four or greater); *In re NASDAQ Market-Makers Antitrust*

---

[7] The billing rates used by Class Counsel here fall within a range of rates that Class Counsel has submitted to and that were approved by a federal district court. *See In re: H&R Block Inc., Express IRA Marketing Litigation,* MDL Dkt. No. 1786, No. 4:06-md-01786, Order, Doc. 232, Order Granting Plaintiffs' Motion for Approval of Attorneys' Fees, Service Fees, and Reimbursement of Expenses (W.D. Mo. May 17, 2010) (finding reasonable billing rates that varied from $425 to $750 an hour for partners, $225 to $485 for associates, and $75 to $290 for professional support staff); *accord Hopson v. Hanesbrands Inc.,* No. CV-08-0844, 2009 WL 928133, at *12 (N.D. Cal. April 3, 2009) (approving billing rates ranging from $675 to $135 an hour in wage and hour litigation). Based on data published by the National Law Journal, Class Counsel's rates are commensurate with hourly lawyers of similar experience handling complex litigation on a national basis. *See, e.g.,* 12/7/2009 N.L.J. 14. For example, three of the largest labor employment law firms reported a range of billing rates that are comparable to those submitted here: $715 to $150 (Jackson Lewis), $625 to $195 (Ogletree, Deakins, Nash, Smoak & Stewart), and $685 to $125 (Littler Mendelson). *Id. See also* Hanson Decl. at ¶ 16.

1   *Litig.,* 187 F.R.D. 465, 489 (S.D.N.Y. 1998) ("In recent years multipliers of between 3 and 4.5

2   have become common.").[8]

3        For these reasons, Class Counsel's request for 25% of the settlement fund (less $2,000) is

4   fully justified by the fact that it is equal to or less than the benchmark set by the Ninth Circuit

5   and fully supported by each of the relevant factors and is further supported by a lodestar

6   crosscheck.  The Court should, therefore, approve the fee as agreed upon between the parties.

7   **III.  THE REQUESTED SERVICE AWARDS ARE REASONABLE**

8        "Because a named plaintiff is an essential ingredient of any class action, an incentive

9   award is appropriate if it is necessary to induce an individual to participate in the suit." *Cook v.*

10  *Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).  Mr. Soliz and Mr. Chavez are eminently

11  deserving of $7,500 service awards, for without their willingness to step forward this

12  $14,850,000 settlement would not have been possible.  They are directly responsible for the

13  benefits of this settlement made available to 16,650 people.  *See* Hanson Decl. at ¶ 17.

14       The Class Notice fully disclosed that Class Counsel would seek these awards, stating that

15  "Class Counsel will also ask the Court to approve a service award to each of the two California

16  Class Representatives in an amount not to exceed $15,000."  Courts routinely approve awards in

17  these amounts.  *See, e.g., Woo v. Home Loan Group, L.P.*, No. 07-CV-202, 2008 WL 3925854,

18  at *6 (S.D. Cal. Aug. 25, 2008) ("The Court further approves a payment to the Class

19  Representative . . . as an enhancement in the amount of $7,500 for the initiation of this action,

20  services performed, and the risks undertaken . . ."); *Fulford v. Logitech, Inc.*, No. 08-cv-02041,

21  2010 WL 807448, at *3 n.1 (March 5, 2010) (collecting cases awarding service payments

22  ranging from $5,000 to $40,000); *In re Sorbates Direct Purchaser Antitrust Litig.*, 2002 WL

23  31655191, at *3 (N.D. Cal. Nov. 15, 2002) (approving $7,500 service awards).

24       The Ninth Circuit has identified three factors that a Court should consider in approving a

25  service award:  "[1] the actions the plaintiff has taken to protect the interests of the class, [2] the

26

27  [8] These amounts do not include the value of the time and the costs incurred by the attorneys in

28  the *Fairley* matter.

degree to which the class has benefitted from those actions, and [3] the amount of time and effort the plaintiff expended in pursuing the litigation." *Staton,* 327 F.3d at 976 (citing and quoting factors from *Cook,* 142 F.3d at 1016). The first two factors clearly support the requested award, as the California Class Representatives' efforts have resulted in a $14,850,000 settlement fund that makes significant monetary relief available to 16,650 individuals. The third factor also supports the award as the California Class Representatives have made a significant investment of time and effort in this matter, including:

- meeting with Class Counsel to discuss the factual allegations and legal theories and assisting in the preparation of the complaint;

- traveling to and attending several town hall meetings with Class Counsel across California;

- providing input and guidance during the negotiation and settlement process, including approving the settlement and signing the settlement agreement on behalf of the Class;

- keeping themselves and other plaintiffs informed about the progress of the litigation;

- preparing for and sitting for day-long depositions, subjecting themselves to cross examination, and answering individual discovery; and

- risking retaliation by agreeing to act as representatives and putting their names on the complaint.

In Class Counsel's opinion, they have acted in the very best interest of the class at all times and are deserving of the $7,500 service awards requested on their behalf. *See* Hanson Decl. at ¶ 17.

## CONCLUSION

Respectfully, this settlement should be approved as fair, reasonable and adequate. Class Counsel's fee request should be approved at 25% of the California Class Settlement Fund (less $2,000) in the amount of $3,710,500. And service awards in the amount of $7,500 each should be approved to the two Class Representatives.

**Dated: May 20, 2010**                    Respectfully submitted,

                                           _____/s/ George A. Hanson_____
                                           George A. Hanson MO Bar # 43450
                                           (*admitted pro hac*)
                                           STUEVE SIEGEL HANSON LLP
                                           460 Nichols Road, Suite 200
                                           Kansas City, Missouri 64112
                                           Tel:    816-714-7100
                                           Fax:    816-714-7101

                                           Jason S. Hartley CA Bar No. 192514
                                           STUEVE SIEGEL HANSON LLP
                                           550 West C Street, Suite 610
                                           San Diego, California 92102
                                           Email: hartley@stuevesiegel.com
                                           Tel:    619-400-5822
                                           Fax:    619-400-5832

                                           Bradford B. Lear MO Bar # 53204
                                           (*admitted pro hac*)
                                           Todd C. Werts MO Bar # 53288
                                           (*admitted pro hac*)
                                           LEAR WERTS LLP
                                           2003 W. Broadway, Ste. 107
                                           Columbia, Missouri 65203
                                           Tel:    573-875-1991
                                           Fax:    573-875-1985

                                           **ATTORNEYS FOR PLAINTIFFS**

## PROOF OF SERVICE

I am over the age of 18 years and not a party to the cause; I am admitted *pro hac vice* in this Court and my business address is 460 Nichols Road, Suite 200; Kansas City, Missouri 64112.  I caused the following documents, including exhibits attached thereto, to be served on the date stated herein:

- MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPLICATION FOR ATTORNEY'S FEES AND SERVICE AWARDS

and addressed as set forth below, to the following parties:

James J. OH
Littler Mendelson
200 North La Salle Street
Suite 2900
Chicago, Illinois  60601-1014
TEL:  (312) 372-5520
FAX:  (312) 372-7880
joh@littler.com

Eric A. Grover
Jade Butman
Keller Grover LLP
425 Second Street, Suite 500
San Francisco, California 94107
TEL:  (415) 543-1305
FAX:  (415) 543-7861
eagrover@kellergrover.com
jbutman@kellergrover.com

Jody A. Landry
Littler Mendelson
501 West Broadway, Suite 900
San Diego, California 92101-3577
TEL: (619) 232-0441
FAX: (619) 232-4302
jlandry@littler.com

Attorney for Defendant

__XX__ **(VIA CM/ECF ELECTRONIC FILING):**  I transmitted via the Internet a true copy(s) of the above-entitled documents(s) to the CM/ECF system of the U.S. District Court for the Southern District of California and concurrently caused the above-entitled document(s)  to be sent to the recipients listed pursuant to the Service List maintained by and as it exists on that database.  The file transmission was reported as complete and a copy of the Receipt Page/Confirmation will be maintained with the original document(s) in this office.

_____ **(BY FACSIMILE or EMAIL)**:    The above-referenced document(s) was/were transmitted by facsimile transmission and/or email and the transmission was reported as complete and without error.

_____ **BY PERSONAL SERVICE:**  By causing to be hand delivered, at 550 West B Street, Suite 400, San Diego, California, a copy of the above document to the party set forth above.

__XX__ **(FEDERAL):**  I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.  Executed on May 20, 2010, at Kansas City, Missouri.

_____/s/ George A. Hanson_____
GEORGE A. HANSON

Memo in Support of Final Approval                    26